**In re DURABILITY, INC., Debtor.**

No. 86–02594–M.

United States Bankruptcy Court,
N.D. Oklahoma.

Feb. 15, 2002.

**649**

Marc F. Conley, James R. Eagleton, Tulsa, OK, for Plaintiff.

Terry M. Thomas, Tulsa, OK, for Defendant.

## MEMORANDUM OPINION

TERRENCE L. MICHAEL, Bankruptcy Judge.

THIS MATTER came on for trial on November 5, 2001, on the Motion to Assume Executory Contract (the "Motion"), filed by Scott P. Kirtley, Successor Trustee herein ("Trustee" or "Kirtley"). Pursuant to the Motion, the Trustee seeks authority to assume a certain contract of insurance issued by Jefferson Pilot Insurance Company, formerly known as Sovereign Life Insurance Company ("Jefferson Pilot" or "Sovereign"). Jefferson Pilot opposes the Motion. At trial, the Court received evidence and heard argument from the parties. At the conclusion of the trial, the Court provided the parties with the opportunity to submit written briefs. The last of these briefs was submitted on December 20, 2001, and the matter is now ripe for decision. The following findings of fact and conclusions of law are made pursuant to Bankruptcy Rule 7052, which is made applicable to this contested matter by Bankruptcy Rule 9014.

### Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b).[1] Reference to the Court of this matter is proper pursuant to 28 U.S.C. § 157(a). This is a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(A) and (O).

### Procedural Background

The Motion has been pending for the nearly unbelievable period of just over fif-

---

1. Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (West 2002).

teen years. Given this fact, some bit of procedural history is in order. On October 6, 1986, an involuntary petition for relief under Chapter 7 of the United States Bankruptcy Code was filed against Durability, Inc. ("Durability"). Initially, James R. Adelman ("Adelman") was appointed to serve as Trustee. On January 20, 1987, Adelman filed the Motion. Thereafter, on May 12, 1987, Adelman filed a motion with the Court seeking to stay all proceedings relating to the Motion. *See Docket No. 115.* An order staying all proceedings with respect to the Motion was entered on May 26, 1987. *See Docket No. 121.* Sometime thereafter, Adelman resigned as Trustee. Kirtley was appointed Successor Trustee on May 23, 1988. *See Docket No. 172.*

The court file reflects no activity in this case with respect to the Motion for several years after the Court granted Adelman's request for a stay. On July 14, 1994, on its own motion, the Court entered an order for a status conference on all pending matters in the Durability case, including the Motion. *See Docket No. 274.* Thereafter, on September 9, 1994, a scheduling order was entered with respect to the Motion. *See Docket No. 275.* On October 20, 1994, that scheduling order was vacated upon the request of Kirtley. *See Docket No. 279.* On October 24, 1994, the Court scheduled a pretrial conference with respect to the Motion for December 28, 1994. *See Docket No. 280.* That pretrial conference was stricken at the joint request of Kirtley and Jefferson Pilot. *See Docket Nos. 295 and 296.*

During the period between January 8, 1995, and March 8, 1995, both Kirtley and Jefferson Pilot filed motions for summary judgment with respect to the Motion. *See Docket Nos. 297, 298, 299, 301, 302, 303*

*and 305.* On July 25, 1997, this Court scheduled a status hearing with respect to the Motion for August 19, 1997. *See Docket No. 306.*[2] The August 19, 1997, hearing was held and concluded. Thereafter, on January 28, 1998, this Court entered its Memorandum Opinion and Order granting the motion for summary judgment filed by Jefferson Pilot, and overruling the motion for summary judgment filed by the Trustee. *See Docket Nos. 307 and 308.* That decision was appealed by Kirtley to the United States District Court for the Northern District of Oklahoma (the "District Court"), which entered an order affirming this Court's decision on March 4, 1999. *See Docket No. 324.* Kirtley appealed the decision of the District Court to the United States Court of Appeals for the Tenth Circuit. On May 15, 2000, that court reversed the decision of the District Court and this Court, and remanded the case to the District Court for further proceedings. *See In re Durability, Inc.,* 212 F.3d 551 (10th Cir.2000). That same day, the District Court remanded the Motion to this Court for further proceedings. *See Docket No. 327.* Upon remand, this Court established a schedule for completion of discovery and submission of a pre-trial order. After much legal skirmishing between the parties, a pre-trial order was ultimately entered, and the matter tried on November 5, 2001.

### Findings of Fact

Durability was a corporation engaged in the business of manufacturing commercial furniture. Durability's principal was Fred I. Palmer II ("Palmer"). As part of its business plan, Durability purchased three life insurance policies insuring Palmer's life.

---

**2.** At no time between March 9, 1995, and July 25, 1997, did either Kirtley or Jefferson Pilot file any pleadings with the Court with respect to the Motion.

| Company | Policy Number | Amount |
| --- | --- | --- |
| Sovereign/Jefferson Pilot | # 197579 | $1,000,000 |
| Guarantee Mutual Life Company | # 21633044 | $1,000,000 |
| Sovereign/Jefferson Pilot | # 182155 | $ 500,000 |

Only Policy # 182155 (the "Policy") remains at issue.[3]

The Policy was issued on May 3, 1984. Under its terms, premiums were due on the third day of each month. Premiums were to be paid in advance, with a premium payment paying the Policy current to the third of the next month. The Policy contained a thirty-one (31) day grace period for the payment of premiums. Any premiums received within thirty-one (31) days after the due date would be applied to the Policy and the Policy would stay in full force and effect. Under the Policy, Durability was not obligated to continue insurance coverage or make the premium payment. If the Policy lapsed, Durability could reinstate the Policy within five years of lapse, provided that Durability provided proof that Palmer was insurable at the time of reinstatement and paid all past due premiums, plus interest on those premiums at an annual rate of five percent. *See Sovereign Exhibit 2-3.*

On May 15, 1984, Palmer, on behalf of Durability, authorized Sovereign to make drafts upon checking account # 1673805 of Durability at Fourth National Bank (the "Durability Account") for the purpose of paying the premiums due under the terms of the Policy. Palmer executed and delivered to Sovereign a form entitled "Draft Authorization." Under the terms of the Draft Authorization, Durability could choose to have the Durability Account drafted on either the first or the fifteenth of each month. Durability elected to have the draft issued on the fifteenth of each month. The Draft Authorization expressly provided that "[t]his authorization does not modify or change the provisions of any policy or policies of life insurance except that the right of the insured to receive a premium notice is hereby expressly waived." *Trustee's Exhibit 3.*

Durability later encountered financial difficulties. On August 15, 1986, the District Court in and for Tulsa County appointed Richard Sullivan ("Sullivan") to serve as receiver for Durability. On that same day, Sovereign issued a draft (the "August 15, 1986 Draft") upon the Durability Account for $131.75, representing the premium due August 3, 1986. The August 15, 1986 Draft was returned to Sovereign as unpaid due to insufficient funds in the Durability Account. The August 15, 1986 Draft was apparently presented for collection a second time on September 8, 1986.[4] The uncontradicted testimony of Mr. Kent Van Koughnet, a director and assistant vice president of Sovereign during the relevant time period, was that Sovereign first learned of the dishonor of the August 15, 1986 Draft on September 18, 1986. *See Trustee's Exhibit 57, page 61, lines 8—13.*[5]

On September 15, 1986, Sovereign issued a draft (the "September 15, 1986 Draft") upon the Durability Account for $131.75, representing the premium due September 3, 1986, under the terms of the Policy. The September 15, 1986 Draft was

---

3. Upon the death of Palmer (discussed *infra* ), the death benefits under each of the first two policies were paid to the Trustee without dispute.

4. The record is silent as to how the August 15, 1986 Draft came to be presented for payment a second time.

5. Mr. Van Koughnet's testimony is supported by the August 15, 1986 Draft, which contains a notation that it was received by Sovereign on September 18, 1986. *See Trustee Exhibit 11.*

paid by Fourth National Bank on or about September 22, 1986.[6] *See Trustee's Exhibit 17A.* These funds were originally applied by Sovereign to the premium payment due September 3, 1986. At some time after the August 15, 1986 Draft was dishonored for the second time, Sovereign reversed the payment entry, and applied the funds paid under the September 15, 1986 Draft to the premium payment due August 3, 1986.

On September 19, 1986, Sovereign sent a Notice of Returned Check to Durability. *See Trustee's Exhibit 18.* The Notice of Returned Check advised Durability that the August 15, 1986 Draft had been returned with the notation "NSF." The Notice of Returned Check further advised Durability that a premium of $131.75, representing the premium due September 3, 1986, was due to Sovereign on or before Saturday, October 4, 1986. The Notice of Returned Check was sent to Durability using the address of 5531 East Admiral, Tulsa, Oklahoma 74115, which was the address listed for Durability by Palmer on the application for the Policy. *See Jefferson Pilot Exhibit 2–20.* The premium due September 3, 1986, was not received by Sovereign on or before October 4, 1986.

This bankruptcy case was initiated by the filing of an involuntary Chapter 7 petition against Durability on October 6, 1986. On October 7, 1986, the Court entered its order for relief and appointed Adelman as Trustee. Upon his appointment, Adelman did not inform Sovereign of the pending bankruptcy case. At one point in time, Adelman determined that it would be in the best interests of the estate of Durability to abandon any interest in the Policy, as the Policy appeared to be pledged to the Fourth National Bank and there appeared to be sufficient other assets to pay all creditors in full. In any event, Sovereign received no funds in payment of premiums for the Policy between October 6, 1986, and November 18, 1986.

The Policy permits reinstatement within five years of the date of lapse, provided certain conditions are met. One of the conditions of reinstatement is that the insured must continue to be insurable by Sovereign's standards. However, in 1986, Sovereign had an internal corporate policy of waiving the continuing insurability condition for reinstatement of lapsed policies for seventy-five (75) days following the last premium due date. This internal corporate policy regarding reinstatement was not included within the terms of the Policy. Pursuant to its internal corporate policy, Sovereign sent a mailgram (the "Mailgram") dated November 5, 1986, to the Debtor advising it that the Policy had lapsed but offering to reinstate the Policy without evidence of insurability if a premium payment in the amount of $263.50 was received on or before November 12, 1986. *See Trustee's Exhibit No. 24.* No money was received by Sovereign or any of its agents on or before November 12, 1986. On November 13, 1986, Palmer had surgery. At that time, it was determined that Palmer had cancer which was diagnosed as terminal.

On November 19, 1986, Adelman attempted to tender to Sovereign all past due premium payments on the Policy. Said funds were tendered to Mark Fahrquahr ("Fahrquahr").[7] Fahrquahr

---

6. It appears that the September 15, 1986 Draft was paid using funds from an account in the name of Mr. Sullivan. Although the September 15, 1986 Draft was drawn upon the Durability Account, it was paid from account number 6379085, which Mr. Sullivan

testified was set up in his name at Fourth National Bank upon his appointment as receiver for Durability. Mr. Sullivan testified that he authorized the payment.

7. At one point in this contested matter, the Trustee submitted an affidavit executed by

was a soliciting agent but not a general agent of Sovereign. Fahrquahr, as a soliciting agent, simply forwarded documents to Sovereign's general agent for approval or rejection. Fahrquahr had no authority to make a decision regarding the insurability of a person. That decision was made by the home office. Fahrquahr forwarded the premiums he received from the Trustee to Sovereign but made no representation that Sovereign would reinstate the policy. Sovereign refused to accept the tendered premiums or reinstate the Policy until Durability complied with the Policy's conditions for reinstatement, including providing evidence of continued insurability. Durability never attempted to comply with these conditions, presumably due to Palmer's medical condition. By letter dated December 16, 1986, Sovereign informed the Trustee that the policy had lapsed for nonpayment of premiums.

Palmer died on March 3, 1989. After learning of the death of Palmer, Sovereign sent a proof of death form to the Trustee together with instructions for making a claim. Sovereign acknowledged that the premiums on Policy No. 195579 were paid and that Sovereign would pay a death benefit of $1,000,000.00 upon receipt and approval of the proof of death. Said benefit was timely paid. However, Sovereign has refused to pay any benefits with respect to the Policy.

At this time, all creditors of Durability have been paid in full. The owner of the stock of Durability is Beth Palmer, Personal Representative of the Estate of Fred I. Palmer II. The estate of Fred I. Palmer

II is the only remaining interested party in this bankruptcy case. Said estate has previously received a distribution of $113,196.38 from the bankruptcy estate of Durability.

To the extent the "Conclusions of Law" contain any items which should more appropriately be considered "Findings of Fact," they are incorporated herein by this reference.

## Conclusions of Law

 Both Sovereign and the Trustee concede that the Policy constitutes an executory contract for purposes of § 365.[8] As the Tenth Circuit Court of Appeals noted, "[w]hether the policy was an assumable executory contract turns on the question of whether the contract terminated before bankruptcy was filed." *In re Durability, Inc., supra,* 212 F.3d at 557–558. The law is well established that "the filing of a bankruptcy case cannot resurrect an executory contract or unexpired lease which has expired prior to the filing of the bankruptcy case." *In re Oklahoma Trash Control, Inc.,* 258 B.R. 461, 464 (Bankr. N.D.Okla.2001) (and cases cited therein). The Trustee alleges that the Policy remained in force on October 6, 1986, because: (1) the conduct of Sovereign in issuing the September 15, 1986, Draft operated as a waiver of the default in payment of the premium due August 3, 1986; (2) the execution of the Draft Authorization with a draft date of the fifteenth of each month operated to modify the Policy, changing the premium due date from the third to the fifteenth; (3) because October 4, 1986, fell on a Saturday, the grace peri-

---

Adelman in which Adelman testified that he submitted payments to Fahrquahr on November 12, 1986. *See Docket No. 53.* Adelman recanted the contents of said affidavit at trial.

**8.** The issue of whether the Policy constituted an executory contract was fully explored by this Court in its January 28, 1998, memoran-

dum opinion. *See Docket No. 307.* Neither party has contested the Court's ruling in this regard. Indeed, the issue of whether the Policy constitutes an executory contract is not raised in the pre-trial order. *See Docket No. 401.*

od under the Policy automatically extended to October 6, 1986, the next business day; and (4) the Policy had not lapsed on October 4, 1986, due to fraud on the part of Sovereign. If rights under the Policy existed as of October 6, 1986, then the Trustee had 60 days from and after that date to assume the Policy. *See In re Durability, Inc., supra,* 212 F.3d at 558.

*Waiver of the Default in Payment of the August 3, 1986 Premium*

The Trustee argues that the conduct of Sovereign in issuing the September 15, 1986 Draft and accepting the funds which it represented constituted a waiver of the default in payment as a result of the dishonor of the August 15, 1986 Draft. Sovereign denies that any such waiver occurred. In support of its position, Sovereign contends that: (1) it was not aware of the dishonor of the August 15, 1986 Draft until after it issued the September 15, 1986 Draft; (2) the application of the funds received pursuant to the September 15, 1986 Draft to the unpaid premium due August 3, 1986, was proper; and (3) it gave Durability notice of the unpaid premium in a timely manner.

Neither party contests the applicability of Oklahoma law to the facts before the Court. The Oklahoma Supreme Court has ruled that

We regard the law as well settled that such provisions in an insurance policy [requiring prompt payment of premiums] are for the benefit of the insurer, and may be waived by the insurer. And likewise that such waiver may be shown by a course of action on the part of the insured which treats the policy as a valid and subsisting policy which the insurer could have declared forfeited because of a breach or nonpayment. And likewise that the insurer may by a course of conduct be estopped from asserting ces-

sation or lapse of a policy for nonprompt payment where there was a course of action or custom to accept payments out of time, . . .

However, it is quite generally held that the provisions of an insurance policy requiring prompt payment of the premiums, and the provisions for lapse or cessation of the policy for nonprompt payment are valid, essential, and enforceable provisions of the contract, and that the insurer cannot be denied the benefits of such wholesome provisions of the policy, unless the insurer has voluntarily waived the same, or is held to have waived the same by some act indicating an intention not to act or rely upon the lapse or cessation, or has proceeded or acted in a way or manner wholly inconsistent with the enforcement of the provisions for lapse or cessation for nonprompt payment. No authorities are cited which are contrary to these announced rules.

*Great Southern Life Ins. Co. v. Brooks,* 166 Okla. 123, 26 P.2d 430, 433 (1933) (citations omitted); *see also Exch. Trust Co. v. Capitol Life Ins. Co.,* 49 F.2d 133, 135 (10th Cir.1931) (noting ability of insurer to waive nonpayment of premium as grounds for policy lapse).

In the present case, Sovereign issued drafts against the Durability Account on August 15, 1986, and September 15, 1986, for the Policy premiums due August 3, 1986, and September 3, 1986, respectively. Both of these drafts were issued in accordance with the terms of the Policy and the Draft Authorization. Sovereign did not discover that the August 15, 1986 Draft had been dishonored until after it issued the September 15, 1986 Draft. Immediately upon learning of the dishonor of the August 15, 1986 Draft, Sovereign advised Durability that a payment of $131.75 must be made on or before October 4,

1986, in order to keep the Policy in force. In doing so, Sovereign took the money which it had received pursuant to the September 15, 1986 Draft and applied it to the oldest unpaid premium, which was due August 3, 1986. These facts do not establish that Sovereign waived its right to payment of the premiums owed to it. To the contrary, the conduct of Sovereign indicates that it did not intend to waive its right to such premiums, and demanded (in accordance with the terms of the Policy) that Durability bring the premiums on the Policy current on or before October 4, 1986, the date the grace period would expire. The Court finds that Sovereign did not waive its rights to payment in accordance with the terms of the Policy.

In support of his position that the conduct of Sovereign in presenting the September 15, 1986 Draft constituted a waiver of Durability's prior default, the Trustee relies upon two cases, *Bohannon v. Guardsman Life Ins. Co.*, 224 Neb. 701, 400 N.W.2d 856 (1987) (hereafter *"Bohannon"*) and *Central American Life Ins. Co. v. Krause*, 284 S.W.2d 192 (Tex.Civ.App. 1955) (hereafter *"Krause"*). The Trustee is correct that in each of these cases, the insurer was held to have waived a default in premium payment for a given month by accepting a premium payment for a subsequent month. However, each case is factually distinguishable from the present case. In *Bohannon*, the insurer, with full knowledge of the default in payment of the prior month's premium, demanded and received payment of the premium due in the subsequent month. In addition, the check received and honored for the premium last

due contained an express notation that it represented the premium due in that month. *See Bohannon*, 400 N.W.2d at 858. Similarly, in *Krause*, the Court found "that the appellant [insurance] company knew the April 18th premium draft had been returned to it unpaid prior to May 8th when it deposited its draft for the premium due May 18th." *Krause*, 284 S.W.2d at 194. In the present case, the Court has concluded based upon the testimony of Mr. Van Koughnet that Sovereign did not have notice of the dishonor of the August 15, 1986 Draft until after it issued the September 15, 1986 Draft.[9] This fact renders *Bohannon* and *Krause* inapplicable to the case at bar.

*Modification of the Policy by the Draft Authorization*

■ Under the terms of the Policy, premiums were due on the third of each month. In addition, the Policy provided a thirty-one (31) day grace period after the due date of the Policy during which premiums could be paid without penalty or loss of coverage. Under the terms of the Draft Authorization, Durability elected to have the Durability Account drafted on the fifteenth of each month for premium payments due on the third. The Trustee contends that the effect of the Draft Authorization was to modify the premium due date under the Policy, changing it from the third to the fifteenth. The Trustee thus argues that if the grace period began to run on September 15, 1986, then it had not expired on October 6, 1986, the date Durability's bankruptcy case was filed. If that is the case, then the Trustee had sixty days from October 6, 1986, to cure any

---

9. In his brief, the Trustee argues that "Someone at JP [Jefferson Pilot] *had* to have been involved in the submission of the [August 3, 1986] draft after it was returned the first time." *See Trustee's Closing Brief in Support of Motion to Assume Executory Contract, Docket No. 412*, at p. 13 (emphasis added).

To the contrary, there is no evidence in the record from which the Court can determine how the August 15, 1986 Draft came to be presented to the bank a second time. The only evidence in the record regarding this matter is the testimony of Mr. Van Koughnet.

defaults under the Policy, and the November 19, 1986, tender of premiums was timely. *See Durability,* 212 F.3d at 558–559.

In order to rebut the contention of the Trustee, Sovereign relies upon the language of the Policy and the Draft Authorization. The Policy contains the following provisions:

**Premiums**—To keep this policy in force each premium must be paid in advance. All premiums must be paid at our Home Office or to an agent or cashier authorized by us. We will issue a receipt upon request. The first premium is due as of the policy date. Subsequent premiums are payable while the Insured is living and within the grace period. If any premium remains unpaid after the grace period, this policy will **lapse** subject to the non-forfeiture provisions. If a part of the premium ceases to be payable under the provisions of a rider, the premium will be reduced accordingly. The mode of premium payment may be changed on any policy anniversary to any other mode shown on Page 1.

**Grace Period for Paying Premiums**—We will allow a period of 31 days after the premium due date for payment of each premium after the first. During this grace period no interest will be charged on the premium due. If the Insured dies during the grace period before the premium is paid, the premium required to provide insurance from the premium due date to the date of the Insured's death will be deducted from the proceeds payable under this policy.

**Policy Date**—The policy date will be used to determine the premium due dates, policy anniversaries and policy years.

*See Jefferson Pilot Exhibit 2–3.* The Draft Authorization expressly provides that "[t]his authorization does not modify or change the provisions of any policy or policies of life insurance except that the right of the Insured to receive a premium notice is hereby expressly waived." *See Jefferson Pilot Exhibit 3.*

The Trustee's argument relies in large part upon the following Oklahoma statutory provision:

There shall be a provision that a grace period of thirty (30) days, or, at the option of the insurer, of one (1) month of not less than thirty (30) days, shall be allowed within which the payment of any premium after the first may be made, during which period of grace the policy shall continue in full force; but if a claim arises under the policy during such period of grace before the overdue premium is paid the amount of such premium may be deducted from the policy proceeds.

36 Okla. Stat. Ann. § 4003 (West 1991). The Trustee correctly argues that under Oklahoma law, this statutory provision is part of the Policy. *See Dillard & Sons Constr., Inc. v. Burnup & Sims Comtec, Inc.,* 51 F.3d 910, 915 (10th Cir.1995). The question is not whether the Policy provided Durability with a grace period as required by the statute; it did. The question is whether the Draft Authorization served to change the due date under the Policy. The Court concludes it did not.

■ The modification of a contract requires the mutual assent of the parties. *See Watt Plumbing, Air Conditioning and Elec., Inc. v. Tulsa Rig, Reel & Mfg. Co.,* 533 P.2d 980, 983 (Okla.1975); *see also Okla. Capitol Imp. Auth. v. Nashert & Sons, Inc.,* 518 P.2d 1267, 1270 (Okla.1974). Sovereign did not consent to a modification of the due date under the Policy. The Draft Authorization contains an express provision that it does not modify any terms of the Policy other than the right of Durability to receive notices of premiums when due. The effect of the Draft Authorization

was to allow Durability to pay premiums automatically rather than by sending a check to Sovereign each month. Similarly, the decision of Durability to pay premiums during the contractual grace period did not serve to change the due date under the Policy. The fact that one chooses to avail oneself of the benefit of a grace period does not in and of itself operate to extend that period.

Under the terms of the Policy, premiums were due on the third of each month. The Policy is not ambiguous on this point. The Policy was not modified by either the Draft Authorization or the conduct of the parties. As a result, the argument advanced by the Trustee that premium payments were actually due on the fifteenth must fail.

*Extension of the Grace Period to October 6, 1986*

 It is undisputed that the thirty-first day after September 3, 1986, fell on a Saturday. The Trustee contends that because Saturday is not a business day, the grace period under the Policy must be extended to the next business day, which was Monday, October 6, 1986, which was the date an involuntary bankruptcy petition was filed against Durability. In making this argument, the Trustee relies upon the following Oklahoma statutory provision which existed in 1986:

A. COMPUTATION. In computing any period of time prescribed or allowed by this title, by the rules of any court, by order of the court, or by any applicable statute, the day of the act, event, or default from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a legal holiday as defined by the Oklahoma Statutes or any other day when the office of the court clerk does not remain open for

public business until 4:00 p.m., in which event the period runs until the end of the next day which is not a Saturday, a Sunday, or a legal holiday as defined by the Oklahoma Statutes or any other day when the office of the court clerk does not remain open for public business until 4:00 p.m. When the period of time prescribed or allowed is less than seven (7) days, intermediate Saturdays, Sundays, and legal holidays as defined by the Oklahoma Statutes or any other day when the office of the court clerk does not remain open for public business until 4:00 p.m., shall be excluded in the computation.

12 Okla. Stat. Ann. § 2006A (West 1993) (hereafter " § 2006A"). The Trustee contends that this statute applies to insurance contracts, and that, as a result, the grace period remained in full force and effect on the date that a bankruptcy petition was filed against Durability. The Court disagrees.

Section 2006A is part of the Oklahoma Pleading Code, 12 Okla. Stat. Ann. § 2001 *et seq.*, Under its terms, the Oklahoma Pleading Code "governs the procedure in the district courts of Oklahoma in all suits of a civil nature whether cognizable as cases at law or in equity except where a statute specifies a different procedure." 12 Okla. Stat. Ann. § 2001 (West 1993). At least one Oklahoma Supreme Court justice has taken the position that § 2006A is not to be applied beyond the scope of state district court litigation. .

Oklahoma has two major statutory sections that deal with time computation—12 O.S.1991 § 2006A and 75 O.S.1991 § 250.8. Each covers but a narrow stretch of legal chronometry; neither may be applied to compute time limitations for workers' compensation claims. The former's sweep stands confined to district court litigation and to the stat-

utes applicable in the course of proceedings in that forum; the latter's range is restricted to computing time prescribed by the Administrative Procedures Act. Inasmuch as the entire Pleading Code's ambit is explicitly restricted by its § 2001 to district court practice, the phrase "any applicable statute", found in the Code's § 2006A, cannot be viewed as intended to reach one iota further than the Code itself. The § 2001 boundary of the Code would be impermissibly crossed if we were to declare that the § 2006A language may be extended to cover workers' compensation procedure—an adjective-law regime patently dehors the Pleading Code's purview. To put my concern in more dramatic terms, the permissible range of "any applicable statute"—as these words are used in § 2006A—must be deemed circumscribed by the subject statute's pertinence to a district court process in the context of which the time computation is to be made. That requisite pertinence is clearly absent here.

*Camps v. Taylor,* 892 P.2d 633, 636–637 (Okla.1995) (Opala, J., concurring) (footnotes omitted). This Court, having reviewed the Oklahoma Pleading Code and the opinion in *Camps v. Taylor,* finds the reasoning of Justice Opala persuasive, and concludes that § 2006A is not applicable to the grace period contained in the Policy. *See also Loyd v. Fed. Kemper Life Assur. Co.,* 518 N.W.2d 374, 376 (Iowa 1994) ("Where an insurance contract is unambiguous, we will not rewrite the contract by incorporating a statute which does not by its terms apply to private contracts.") (citation omitted).

As further support for its position, the Court notes that on October 6, 1986, there was yet another Oklahoma statute which dealt with time computation and the effect of a deadline falling on a *Sunday.*

The designation and dates of holidays in Oklahoma shall be as follows: Each *Sunday,* New Year's Day on the 1st day of January, Martin Luther King, Jr.'s Birthday on the third Monday in January, Washington's Birthday on the third Monday in February, Memorial Day on the last Monday in May, Independence Day on the 4th day of July, Labor Day on the first Monday in September, Veterans' Day on the 11th day of November, Thanksgiving Day on the fourth Thursday in November, Christmas on the 25th day of December, and if any of such holidays other than Sunday at any time fall on Sunday, the succeeding Monday shall be a holiday in that year. *Any act authorized, required, or permitted to be performed on a holiday as designated in this section may be performed on the next succeeding business day, and no liability or loss of rights of any kind shall result from such delay.*

25 Okla. Stat. Ann. § 82.1 (West 1987) (hereafter "§ 82.1") (emphasis added). Under § 82.1, if an act is required to be performed on a specified holiday, it may be performed on the next business day without penalty or loss. Interestingly, § 82.1 makes no mention of Saturday as a legal holiday. Had the Oklahoma Legislature intended to include Saturdays within the province of § 82.1 in 1986, it could have done so.[10] The existence of § 82.1 makes it improbable that the Oklahoma Legislature intended § 2006A to apply outside the scope of district court litigation.

The Trustee also relies upon the following Oklahoma statute to support his position that the grace period under the

---

10. Indeed, the Oklahoma Legislature amended § 82.1 in 1996 to include Saturdays within its scope. *See* 25 Okla. Stat. Ann. § 82.1(A) (West Supp.2001).

Policy did not expire until Monday, October 6, 1986:

> In computing any period of time prescribed or allowed by this title, by the rules of the Commissioner or the State Board for Property and Casualty Rates, or by any applicable statute, the day of the act, event, or default from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is a Saturday, a Sunday, a legal holiday as defined by the Oklahoma Statutes, or any day when the office of the Commissioner does not remain open for public business until 4:00 p.m., in which event the period runs until the end of the next day when the office of the Commissioner is open until 4:00 p.m. When the period of time prescribed or allowed is less than seven (7) days, intermediate Saturdays, Sundays and legal holidays shall be excluded in the computation.

36 Okla. Stat. Ann. § 121 (West 1999) (hereafter " § 121"). This statute has an effective date of November 1, 1997. *See id.* The Oklahoma Supreme Court has held that

> The general rule is that statutes are intended to operate prospectively unless the Legislature clearly expresses a contrary intent. If doubt exists, it must be resolved against a retroactive effect. However, remedial or procedural statutes which do not create, enlarge, diminish or destroy vested rights may operate retrospectively, and apply to pending actions or proceedings. A purely procedural change is one that affects the remedy only, and not the right. Application of § 87.2 to the instant cause would alter more than the potential remedy, it would preclude ONG from participating in the action. *Statutes which act as a*

*complete bar to assertion of an interest affect rights rather than just remedies.* *Forest Oil Corp. v. Corp. Comm'n of Oklahoma,* 807 P.2d 774, 781–782 (Okla.1990) (footnotes omitted) (emphasis added); *see also Walls v. American Tobacco Co.,* 11 P.3d 626, 631 (Okla.2000) ("Additionally, statutes that effect changes in substantive rights are presumed to operate prospectively.") (citations omitted); *see also Sudbury v. Deterding,* 19 P.3d 856, 860 (Okla. 2001) ("A substantive change that alters the rights or obligations of a party cannot be viewed as solely a remedial or procedural change and cannot be retrospectively applied.") (citation omitted).

The Trustee argues that notwithstanding the effective date of § 121, it should be applied to a set of facts which occurred more than eleven years prior to its passage. If the Court were to so apply § 121, it would create a cause of action where none would otherwise exist, for if § 121 applies, then the grace period under the Policy did not expire until October 6, 1986, whereas if § 121 does not apply in this instance, then the grace period expired on October 4, 1986. It seems to this Court that if "[s]tatutes which act as a complete bar to assertion of an interest affect rights rather than just remedies" may not be applied retrospectively, then statutes which create rights where they otherwise would not exist are equally barred from retrospective application. The Court rejects the argument that § 121 applies to the facts of this case.

■ Finally, the Court considers whether there is some sort of common law rule which would extend the grace period under the Policy from Saturday, October 4, to Monday, October 6, 1986. The parties have provided the Court with no Oklahoma law on point, nor has the Court unearthed any such precedent in the course of its own research. Recent cases dealing with

the issue of contractual performance on Sundays have noted that at one time several states had laws prohibiting the transaction of business on Sundays, thus requiring the extension of the contractual period to the next Monday. *See, e.g., Swiss Bank Corp. v. Dresser Indus., Inc.,* 141 F.3d 689, 693 (7th Cir.1998) (and cases cited therein). However, those courts have noted that "[t]oday, the excusing rule, whether common-law or statute based, is an anachronism, given the amount of commercial activity on Sundays; and it is therefore rejected in most of the recent decisions, unless, of course, it is embodied in a statute." *Id.* (citations omitted).

In the present case, the grace period expired on a Saturday, not a Sunday. There is no evidence which would indicate that Durability was prohibited from tendering the past due premium to Sovereign or its agent on that Saturday. There is no Oklahoma law which would extend the time for performance of Durability's payment obligations under the Policy. The Court concludes that the grace period under the Policy expired on October 4, 1986.

*Fraud on the Part of Sovereign*

The Trustee also spends considerable time arguing that Sovereign has been guilty of fraud in its refusal to pay the amounts due under the Policy. Although the parties listed 97 separate issues of fact and law in the Pre–Trial Order, the issue of fraud is not one of them. In addition, the "evidence" offered by the Trustee in support of his allegations of fraud consists of one document and two affidavits which were neither offered nor received into evidence at the November 5, 2001, trial of the Motion. *See Trustee's Brief at pp. 9—10.* The Court will confine itself to the record which the parties made at trial. *See United States ex rel. Collins v. Ashe,* 176 F.2d 606, 607 (3d Cir.1949).

The Trustee's argument seems to be that Sovereign breached a duty of good faith and fair dealing by failing to inform Durability that the September 3, 1986 Premium was not paid. This argument ignores the fact that Sovereign sent the Notice of Returned Check to Durability on September 19, 1986. The Notice of Returned Check informed Durability of the non-payment of the premium due September 3, 1986, and also informed Durability that the grace period would expire on October 4, 1986.[11] Given the dissemination of this information by Sovereign to Durability, the Court would be hard pressed to find fraud or bad faith on the part of Sovereign, even if such issues were properly before the Court.

*The Mailgram*

█ In prior hearings on this matter, the Trustee has argued that the issuance of the Mailgram by Durability served to

---

**11.** The Trustee offered two exhibits on this issue, Exhibits 18 and 20. Exhibit 18 is the Notice of Returned Check. Exhibit 20 consists of the Notice of Returned Check, together with a separate document entitled "Notice of Premium Due." The Notice of Premium Due contains the following statements:

"YOUR LIFE INSURANCE POLICY HAS LAPSED."
"YOU MAY APPLY FOR REINSTATEMENT BY COMPLETING THE ATTACHED FORM."
"PLEASE DISREGARD THIS NOTICE IF PREMIUM HAS BEEN PAID."

*See Trustee's Exhibit 20.* The record is silent as to when the Notice of Premium Due was sent to Durability. In his deposition, Mr. Van Koughnet was asked several questions regarding the Notice of Returned Check. Interestingly enough, the only exhibit presented to Mr. Van Koughnet for his consideration was the Notice of Returned Check. The Notice of Premium Due was not included in the deposition exhibits. *See Trustee's Exhibit 57, pp. 50—57, Deposition Exhibit 3.* On the record before it, the Court is unable to determine when (or if) the Notice of Premium Due was ever sent to Durability.

extend the time for payment of past due premiums under the Policy to a date after October 6, 1986. The Trustee has also argued that, under § 108 of the Bankruptcy Code, the effect of the Mailgram was to give the Trustee sixty days after October 6, 1986, to pay all past due premiums, thus making the November 19, 1986, tender of past due premiums timely. This issue was once again raised in the Pre–Trial Order. *See Pre–Trial Order,* § VII, ¶¶ 10 and 11. Neither party has chosen to brief the issue, which would justify the Court treating the argument as abandoned. *See Applebaum v. Henderson (In re Henderson),* 134 B.R. 147, 155 (Bankr.E.D.Pa.1991). However, in order to make sure there is no confusion on the issue, and to assist any court which may be asked to review this Court's decision, the Court hereby restates its prior conclusions with respect to the legal effect of the Mailgram.

 Sovereign argues that the 75–day grace period is an internal policy which provides the Trustee with no rights to assume the Policy. In the eyes of the Court, the question is not one of the effect of the internal policy, but of the effect of the Mailgram, and the interplay between the deadlines established under the Mailgram and § 108(b) of the Bankruptcy Code. Section 108(b) provides as follows:

> Except as provided in subsection (a) of this section, if applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor or an individual protected under section 1201 or 1301 of this title may file any pleading, demand, notice or proof of claim or loss, cure a default, or perform any other similar act, and such period has not expired before the date of the filing of the petition, the trustee may only file, cure, or perform, as the case may be, before the later of—

> (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or

> (2) 60 days after the order for relief.

§ 108(b). The purpose of § 108(b) is to "permit the trustee, when he steps into the shoes of the debtor, an extension of time for filing an action or doing some other act that is required to preserve the debtor's rights." *Autoskill, Inc. v. Nat'l. Educ. Support Systems, Inc.,* 994 F.2d 1476, 1483 (10th Cir.1993) (*quoting* H.R.Rep. No. 595, 95th Cong., 1st Sess. 318 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6275). This statute has been held on several occasions to allow for the late payment of insurance premiums. *In re Econo–Therm Energy Systems Corp.,* 80 B.R. 137, 141 (Bankr. D.Minn.1987) (holding that § 108(b) extends statutory and contractual term periods, and that there is no requirement to pay the premiums before the grace period expires); *Counties Contracting and Constr. Co. v. Constitution Life Ins. Co.,* 855 F.2d 1054, 1059 (3rd Cir.1988) (holding that § 108(b) extends the statutory grace period for payment when the bankruptcy petition is filed before the expiration of the grace period).

 In the present case, Sovereign, through issuance of the Mailgram, gave Durability the option to restore its life insurance coverage if past due premiums were paid by a date certain, i.e., November 12, 1986. The Mailgram is in effect an option contract.

> [A]n option contract is essentially an enforceable promise not to revoke an offer. As such, it must satisfy the ordinary requirements of a valid contract, including the provision of adequate consideration to the parties chargeable therein.... [A] failure of consideration [is] "not necessarily fatal to the validity of an option, but it does mean that the

optionor can revoke the option at any time prior to acceptance." This is consistent with the general contract principle that an offer without consideration may be revoked at any time until acceptance, at which time a binding contract is formed which is supported by mutual promises of the parties.

*In re III Enters., Inc. V,* 163 B.R. 453, 461 and n. 6 (Bankr.E.D.Pa.1994) (citations omitted); *aff'd,* 169 B.R. 551 (E.D.Pa. 1994). No consideration was given by Durability or Kirtley to keep the offer to reinstate the policy open. Therefore, the option at issue, as evidenced by the Mailgram, extending the time for acceptance to November 12, 1986, is a gratuitous option. The gratuitous option is valid for the time period stated unless revoked by the optionor, in this case Sovereign, before it is accepted by the optionee, in this case Kirtley or Durability. *See Mobil Oil Corp. v. Wroten,* 303 A.2d 698, 700 (Del.Ch.1973), *aff'd,* 315 A.2d 728 (Del.1973). The offer extended via the Mailgram was not revoked by Sovereign before the November 12, 1986 date, but it was also never accepted by Kirtley or Durability on or before November 12, 1986. It expired of its own terms.

The remaining issue is whether § 108(b) extends the option contract beyond November 12, 1986, its stated expiration date. The United States Court of Appeals for the Tenth Circuit has held that "[a] contract that provides for termination on the default of one party may terminate under ordinary principles of contract law even if the defaulting party has filed a petition under the Bankruptcy Act." *In re Trigg,* 630 F.2d 1370, 1374 (10th Cir.1980) (hereafter *"Trigg"*). The Tenth Circuit Court of Appeals quotes from a decision of the First Circuit:

"If the debtor has committed, or the trustee commits, an incurable breach, the trustee has no continuing rights under the contract. *Cf. Matter of Gulfco Investment Corp.,* 520 F.2d 741 (10th Cir.1975). . . . It would be anomalous indeed if section 29(e) [predecessor to § 108(b)], a provision dealing mainly with suits and claims by the trustee, could be used to alter contractual rights substantially where time is of essence and the debtor or the trustee has defaulted. It would be even more anomalous if, in the case of an option contract, section 29(e) (which gives the trustee or debtor-in-possession 60 days to perfect certain rights of the debtor) allowed the trustee to procure a right that never existed and for which no consideration has ever been paid, i.e., the right to exercise an option long after its termination date."

*Id.* (quoting *Good Hope Refs., Inc. v. R. Benavides,* 602 F.2d 998, 1003 (1st Cir. 1979) (hereafter *"Good Hope Refs."*)). In *Trigg,* the Tenth Circuit did not allow a sixty-day extension of an option contract under § 29(e). Even though the *Good Hope Refineries* case was decided under § 29(e), it discussed the effect of § 108(b) upon option contracts:

Assuming arguendo that the new Act in any way reflects upon the old, we do not think the new section 108(b) helps appellant. When a debtor or trustee fails to exercise or renew an option by paying the agreed price, there is no contractual "default" to be cured. The rights that the debtor purchased for the price of the option have merely expired of their own terms. There is no obligation to exercise or extend such an option, and thus no default when further payment is not made.

*In re Good Hope Refs.,* 602 F.2d at 1003. This Court is compelled to follow Tenth Circuit precedent as established in *Trigg* with regard to § 29(e), the predecessor to

§ 108(b), and adopt the narrow construction of § 108(b). The Court is further swayed to adopt a narrow reading of § 108(b) due to the fact that only minor differences in language exist between the two statutes.

 The option embodied by the Mailgram expired of its own terms on November 12, 1986. The estate did not tender payment of the past-due premiums until November 19, 1986. The option expired without any attempt by the estate to make use of or extend the option. Therefore, the Mailgram does not provide a basis for assumption of the Policy by the Trustee.[12]

## Conclusion

The Court concludes that the Policy was not in existence on October 6, 1986, having lapsed due to default in payment of premiums on October 4, 1986. As a result, there is no insurance policy for the Trustee to assume. The Court need reach none of the other issues raised by the parties. The Motion to Assume Executory Contract filed by Scott P. Kirtley, Successor Trustee herein, is denied.

---

12. There is a line of cases holding that § 108(b) should be interpreted more broadly than its predecessor. *See In re Santa Fe Dev. and Mortgage Corp.*, 16 B.R. 165, 168 (9th Cir. BAP 1981)(hereafter *"Santa Fe"*); *In re Future Growth Enters.*, 61 B.R. 469 (Bankr. E.D.Pa.1986); *In re G–N Partners*, 48 B.R. 462 (Bankr.D.Minn.1985). No circuit court of appeals has reached the same conclusion. The *Santa Fe* court sees "basic differences in syntax between section 29(e) and the current section 108," which allow for the broader applicability of section 108(b) to option contracts. *Santa Fe*, 16 B.R. at 168. This Court does not find that the language of § 108(b) should be read more broadly than § 29(e). Section 29(e) reads as follows:

A receiver or trustee may, within two years subsequent to the date of adjudication or within such further period of time as the Federal or State law may permit, institute proceedings on behalf of the estate upon any claim against which the period of limitation fixed by Federal or State law had not expired at the time of the filing of the petition in bankruptcy. Where, by any agreement, a period of limitation is fixed for instituting a suit or proceeding upon any claim, or presenting or filing any claim, proof of claim, proof of loss, demand, notice, or the like, or where in any proceeding, judicial or otherwise, a period of limitation is fixed, either in such proceeding or by applicable Federal or State law, for taking any action, filing any claim or pleading or doing any act, and where in any such case such period had not expired at the date of the filing of the petition in bankruptcy, the receiver or trustee of the bankrupt, within a period of sixty days subsequent to the date of adjudication or within such further period as may be permitted by the agreement, or in proceeding or by applicable Federal or State law, as the case may be.

Bankr.Act, 11 U.S.C. § 29(e)(1976 Ed.). A determination as to whether "changes in syntax" operate to overrule the *Trigg* decision is best left to the court which authored *Trigg*.